# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| FLEXSHOPPER, INC.,<br><br>                Plaintiff,<br><br>v.<br><br>KATAPULT HOLDINGS, INC.,<br><br>                Defendant. | Case No. 2:24-cv-00795-JRG (Lead) |
| FLEXSHOPPER, INC.,<br><br>                Plaintiff,<br><br>v.<br><br>UPBOUND GROUP, INC.,<br>ACIMA HOLDINGS, LLC, and<br>ACIMA DIGITAL, LLC,<br><br>                Defendants. | Case No. 2:24-cv-00794-JRG (Member) |

## KATAPULT'S MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

*Page*

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF THE ISSUES...............................................................................2

FACTUAL BACKGROUND ......................................................................................3

LEGAL STANDARDS ...............................................................................................5

ARGUMENT ...............................................................................................................6

I.  CLAIM 1 OF THE '682 PATENT IS REPRESENTATIVE. ...........................6

II.  THE CLAIMS ARE INVALID FOR FAILURE TO CLAIM PATENTABLE
    SUBJECT MATTER. .....................................................................................10

    A.  The Claims Are Directed to an Abstract Idea at Alice Step One.......................... 11

        1.  The Claims Are Directed to the Well-Known Business Method for
            Rent-to-Own Transactions. ...................................................... 11

        2.  Claim 1 Is Directed to a Commercial Transaction.................................... 13

        3.  Claim 1 Is Directed to Mental Processes that Can Be Performed in
            the Human Mind. ...................................................................... 14

        4.  The Limitations of Claim 1 Are Recited in Result-Focused,
            Generic Language. ..................................................................... 15

        5.  The Recitation of Generic Computer Components Does Not Make
            the Claims Less Abstract. .......................................................... 18

        6.  The Claims Do Not Recite an Improvement in Computer
            Technology. ............................................................................... 19

        7.  Claim 1 Does Not Solve a Technological Problem Rooted in
            Computer Network Technology. ................................................ 22

    B.  The Claims Do Not Include an Inventive Concept as Required at *Alice*
        Step Two. .................................................................................... 25

III.  THE § 101 ANALYSIS DOES NOT REQUIRE CLAIM CONSTRUCTION. ...............28

CONCLUSION...........................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Accenture Glob. Servs., GmbH* v. *Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013)............................................................27

*AI Visualize, Inc.* v. *Nuance Commc'ns, Inc.*,
  97 F.4th 1371 (Fed. Cir. 2024) ...........................................................15

*Alice Corp.* v. *CLS Bank Int'l*,
  573 U.S. 208 (2014).................................................................. *passim*

*Beteiro, LLC* v. *DraftKings, Inc.*,
  104 F.4th 1350 (Fed. Cir. 2024) .............................................12, 13, 15, 16

*Bilski* v. *Kappos*,
  561 U.S. 593 (2010)...........................................................................12

*In re Bilski*,
  545 F.3d 943 (Fed. Cir. 2008)...............................................................10

*Broadband iTV, Inc.* v. *Amazon.com, Inc.*,
  113 F.4th 1359 (Fed. Cir. 2024) .............................................................9

*buySAFE, Inc.* v. *Google, Inc.*,
  765 F.3d 1350 (Fed. Cir. 2014)..............................................................13

*Canon, Inc.* v. *TCL Elecs. Holdings Ltd.*,
  2020 WL 1478356 (E.D. Tex. Mar. 25, 2020) .........................................5

*ChargePoint, Inc.* v. *SemaConnect, Inc.*,
  920 F.3d 759 ...................................................................................11

*Clear with Computers LLC* v. *Altec Indus., Inc.*,
  2015 WL 993392 (E.D. Tex. Mar. 3, 2015) ................................. *passim*

*Cleveland Clinic Found.* v. *True Health Diagnostics LLC*,
  760 F. App'x 1013 (Fed. Cir. 2019) .......................................................1

*Customedia Techs., LLC* v. *Dish Network Corp.*,
  951 F.3d 1359 (Fed. Cir. 2020).........................................................24, 25

*cxLoyalty, Inc.* v. *Maritz Holdings Inc.*,
  986 F.3d 1367 (Fed. Cir. 2021)........................................................9, 23, 28

## TABLE OF AUTHORITIES

(cont.)

**Page(s)**

*Cyberfone Sys., LLC* v. *CNN Interactive Grp., Inc.*,
    558 F. App'x 988 (Fed. Cir. 2014) .......................................................................15

*DDR Holdings, LLC* v. *Hotels.com, L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014)................................................22, 23, 27, 28

*Elec. Commc'n Techs., LLC* v. *ShoppersChoice.com, LLC*,
    958 F.3d 1178 (Fed. Cir. 2020)................................................................12

*Elec. Power Grp., LLC* v. *Alstrom*,
    830 F.3d 1350 (Fed. Cir. 2016)................................................... *passim*

*Enfish, LLC* v. *Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016)...............................................................18, 19

*Hawk Tech. Sys., LLC* v. *Castle Retail, LLC*,
    60 F.4th 1349 (Fed. Cir. 2023) ..................................................10, 20, 25

*Integrated Claims Sys., LLC* v. *Old Glory Ins. Co.*,
    2020 WL 1027771 (E.D. Tex. Mar. 3, 2020) .........................................29

*Intell. Ventures I LLC* v. *T Mobile USA, Inc.*,
    2018 WL 6584486 (E.D. Tex. Sept. 4, 2018) .........................................22

*Intell. Ventures II LLC* v. *Sprint Spectrum L.P.*,
    2018 WL 6804804 (E.D. Tex. Sept. 24, 2018) .................................5, 10

*Interval Licensing LLC* v. *AOL, Inc.*,
    896 F.3d 1335 (Fed. Cir. 2018)................................................................15, 21

*In re Killian*,
    45 F.4th 1373 (Fed. Cir. 2022) ...............................................................13

*Mayo Collaborative Servs.* v. *Prometheus Lab'ys, Inc.*,
    566 U.S. 66 (2012)....................................................................................10

*Mobile Acuity Ltd.* v. *Blippar Ltd.*,
    110 F.4th 1280 (Fed. Cir. 2024) .............................................................5, 17

*Network Architecture Innovations LLC* v. *CC Network Inc.*,
    2017 WL 1398276 (E.D. Tex. Apr. 18, 2017).........................................30

*PPS Data, LLC* v. *Jack Henry & Assocs., Inc.*,
    404 F. Supp. 3d 1021 (E.D. Tex. 2019)...................................................6, 7

## TABLE OF AUTHORITIES
(cont.)

**Page(s)**

*RecogniCorp, LLC* v. *Nintendo Co.,*
   855 F.3d 1322 (Fed. Cir. 2017)..................................................................................15

*Sanderling Mgmt. Ltd.* v. *Snap, Inc.,*
   65 F.4th 698 (Fed. Cir. 2023) ..............................................................................25, 26

*SAP Am., Inc.* v. *InvestPic, LLC,*
   898 F.3d 1161 (Fed. Cir. 2018)..................................................................................5

*Secured Mail Sols. LLC* v. *Universal Wilde, Inc.,*
   873 F.3d 905 (Fed. Cir. 2017)..................................................................................28

*In re TLI Commc'ns LLC Pat. Litig.,*
   823 F.3d 607 (Fed. Cir. 2016)..................................................................................18

*Trinity Info Media* v. *Covalent, Inc.,*
   72 F.4th 1355 (Fed. Cir. 2023) ................................................................................21

*Two-Way Media Ltd.* v. *Comcast Cable Commc'ns, LLC,*
   874 F.3d 1329 (Fed. Cir. 2017)..................................................................................5

*Umbanet, Inc.* v. *Epsilon Data Mgmt., LLC,*
   263 F. Supp. 3d 647 (E.D. Tex. 2017)................................................................11, 12

*Universal Secure Registry LLC* v. *Apple, Inc.,*
   10 F.4th 1342 (Fed. Cir. 2021) ................................................................................27

*Voter Verified, Inc.* v. *Election Sys. & Software LLC,*
   887 F.3d 1376 (Fed. Cir. 2018)..................................................................................5

*Voxathon LLC* v. *Alpine Elecs. of Am., Inc.,*
   2016 WL 260350 (E.D. Tex. Jan. 21, 2016)...........................................................30

*Weisner* v. *Google LLC,*
   51 F.4th 1073 (Fed. Cir. 2024) ................................................................................26

**Statutes**

35 U.S.C. § 101........................................................................................... *passim*

**Other Authorities**

Fed. Rule Civ. P. 12(b)(6)......................................................................................1, 5

U.S. Patent Nos. 10,089,682 ...........................................................................*passim-*

## REPRESENTATIVE PATENT CLAIM

## U.S. Patent No. 10,089,682

**1.** A system, comprising:

a consumer computer device;

a rent-to-own (RTO) system comprising at least one RTO computer device and a RTO management application, wherein the RTO management application is programmed to provide a RTO website comprising a plurality of RTO user interfaces; and

an e-commerce server in communication with the consumer computer device, wherein the e-commerce server comprises:

an e-commerce website application programmed to provide an e-commerce website comprising a plurality of e-commerce user interfaces, including a checkout interface, to the consumer computer device; and

a RTO plug-in integrated with the e-commerce website application, wherein the RTO plug-in is executable by the e-commerce server to complete an online RTO transaction through the e-commerce website by:

integrating, via the RTO plug-in, a selectable RTO control element in a payment option field of the checkout interface provided to the consumer computer device, wherein the RTO control element is selectable by the consumer to initiate the online RTO transaction as a payment option; and

after selection of the integrated RTO control element by the consumer, providing, via the RTO plug-in, one or more than one RTO user interface received from the RTO management application, to the consumer computer device;

wherein the RTO management application is further programmed to:

receive from the consumer computer device, via the RTO plug-in, input data describing the consumer;

based on the input data, determine a spending limit for the consumer;

receive from the consumer computer device, via the RTO plug-in, an indication of a good selected by the consumer on the e-commerce website;

receive data describing the good, wherein the data describing the good comprises a price of the good and a type of the good;

based on the data describing the good, determine that the good is transaction eligible;

transmit to the consumer computer device, via the RTO plug-in, an indication of terms of the online RTO transaction, wherein the terms indicate a periodic payment due under the online RTO transaction; and

receive from the consumer computer device, via the RTO plug-in, an acceptance of the terms; and

wherein the e-commerce website application is further programmed to, after the acceptance of the terms, provide a transaction confirmation interface to the consumer computer device which indicates the online RTO transaction as complete.

Defendant Katapult Holdings, Inc. ("Katapult") respectfully moves to dismiss Plaintiff FlexShopper, Inc.'s First Amended Complaint ("FAC") for failure to state a claim pursuant to Rule 12(b)(6), because the Asserted Patents[1] are directed to an abstract commercial activity (rent-to-own transactions) without reciting any inventive concept and therefore are patent-ineligible under 35 U.S.C. § 101.

## PRELIMINARY STATEMENT

The patents at issue in this case take old business methods and simply do them on general purpose computers. Such business methods have long been held to be ineligible for patent in the United States. Specifically, the patents relate to rent-to-own ("RTO") transactions that are, as the patents themselves explain, commercial interactions "under which goods are leased or rented in exchange for a regularly scheduled payment with the option to purchase at some point during the agreement." ('682 pat., 1:20-28.) The RTO industry is not new—it "began . . . in the 1950's and 1960's" and was serving "millions" of customers by the time Plaintiff filed its first patent application. (*Id*. at 1:28-36.) In fact, Consolidated Defendant Upbound (f/k/a Rent-A-Center) was founded back in 1973 and has been "conducting a rent to own program online by using computers" since at least 2003. (Ex. A (Office Action dated Jan. 25, 2017 ('682 pat.)) at 19.)[2] Upbound is recognized on the face of each of the Asserted Patents. (*E.g*., '682 pat., [56] (citing 2003 version of Upbound's website).)

The FAC is fatally flawed because all claims of the Asserted Patents are directed to the patent-ineligible idea of facilitating an RTO transaction and do not recite any inventive concept,

---

[1]    U.S. Patent Nos. 10,089,682; 10,282,778; 10,891,687; 11,966,969; and 12,067,611.

[2]    "Relevant prosecution histories are . . . properly considered at the pleadings stage." *Cleveland Clinic Found.* v. *True Health Diagnostics LLC*, 760 F. App'x 1013, 1018 (Fed. Cir. 2019).

failing both steps of the *Alice* test for patent eligibility under 35 U.S.C. § 101.  *Alice Corp.* v. *CLS Bank Int'l*, 573 U.S. 208, 216-18 (2014).

*Step One*.   The claims of the Asserted Patents are directed to facilitating an RTO transaction, which without more is an abstract and patent-ineligible commercial activity.  The claims simply recite the use of generic computer hardware and software to perform generic steps of receiving, processing, and transmitting financial data to facilitate an RTO transaction. Moreover, the patents do not claim any improvement to computer technology.  Instead, the claims simply use generic computers to carry out a well-known commercial activity.  Courts have long held that taking a known commercial activity and claiming to "do it on a computer" is not sufficient to establish a specific improvement in computer capabilities, and is therefore patent-ineligible at *Alice* Step One.

*Step Two*.  The claims of the Asserted Patents fail to recite an inventive concept sufficient to save them at Step Two.  The business method itself—rent-to-own transactions—is old and on its own conventional.  And the computers and related software that implement this business method are generic and used in the claims in conventional and well-understood ways.  In the FAC, Plaintiff highlights software plug-ins, generic APIs, and customer log-in fields as inventive concepts.  (FAC ¶¶ 35, 44, 45.)  But the patents themselves admit that plug-ins were conventional software techniques, commonly available online and easily capable of being designed for this application by skilled artisans; that the APIs are generic and used in conventional ways; and that the customer log-in fields are used simply to perform the well-understood, generic, and conventional step of "logging in" to a computer system.

## STATEMENT OF THE ISSUES

Whether the Asserted Patents are invalid under 35 U.S.C. § 101.

-2-

## FACTUAL BACKGROUND

The Asserted Patents share a common specification which describes the claimed inventions as simply "a computer-implemented system and method for processing a rent-to-own ('RTO') transaction." ('682 pat., 2:55-57.) As the patents admit, "RTO transactions began in the United States in the 1950's and 1960's" and involve goods being "leased or rented in exchange for a regularly scheduled payment with the option to purchase at some point during the agreement." (*Id.* at 1:21-29.) An RTO transaction thus usually involves three parties: a consumer that wants access to a product, a retailer that offers to sell the product, and an RTO provider that pays the retailer for the product after the consumer enters an RTO agreement.

This is an old business method. For decades, a consumer could go to a retailer's brick-and-mortar store, select a good offered for sale by the retailer, and if RTO transactions were offered at the retailer's location, obtain access to the good by entering into an RTO transaction with an RTO provider. (*See* FAC ¶¶ 25-26- (citing '682 pat., 3:13-24).) Alternatively, customers could enter into RTO transactions through "e-commerce channels," which also existed well before the patents. But Plaintiff asserts that the process was "overly cumbersome and inefficient" and that the number of such channels was limited. (*Id.*) Accordingly, the patents purport to "make the RTO industry and an RTO transaction *even more* accessible and efficient to consumers." ('682 pat., 1:45-47 (emphasis added).)

All of the claimed systems and methods use three network-connected computers to complete an RTO transaction as shown, for example, in Figure 9 below. The three computers are identified as a **consumer computer device 20**, a **retailer e-commerce server 530**, and an **RTO provider's RTO management system 540**. ('682 pat., Fig. 9.) Each of these conventional computers facilitates an RTO transaction by carrying out standard computer functions like receiving and transmitting data over a network, displaying data such as websites and interfaces,

and carrying out calculations and executing algorithms.



As the common specification explains, a consumer uses a **consumer computer device 20** to access a network to select products from an e-commerce website and provide to an RTO provider input data needed for an RTO transaction.  (*See, e.g.*, '682 pat., 13:66-14:1.)  The consumer computer device communicates over a generic communications network, such as the Internet, with a **retailer's e-commerce server/computer 530** to select products for an RTO transaction.  (*Id.* at 14:1-6; *see also id.* at 13:20-23.)  **E-commerce server 530** includes an "RTO computer software application," identified in the Asserted Patents as an **RTO plug-in 532**.  (*Id.* at 14:6-14.)  The RTO plug-in "integrate[s] RTO as a payment method" alongside other payment options in the software of the retailer's e-commerce server.  (*Id.* at 14:10-11.)

Through the RTO plug-in, the **retailer's e-commerce server 530** facilitates communications by means of "interfaces" between the consumer computer device and a third generic computer, the **RTO provider's RTO management system 540**.  (*Id.* at 14:5-20.)  This generic computer system includes software identified as an **RTO management application 544**, which receives, through interfaces it provides to the e-commerce server, the information required

to facilitate an RTO transaction with a consumer who has selected that payment option, and to apply "automated decision rules and computer-implemented algorithms" to that data to "estimate, calculate and generate recommendations, spending limits, periodic payments and state or federal compliant agreements under an RTO program." (*Id.* at 13:32-38.) **Management application 544** is further programmed to "provide payment to the retail e-commerce server 530 for the selected good," if the consumer enters into an RTO transaction with the RTO provider. (*Id.* at 14:31-35.)

The specification of the '682 patent makes it clear that the embodiments of the invention comprise pre-existing, conventional technology. (*See, e.g.*, *id.* at 4:33-34 ("The computer device 20 may be any suitable computer or computing device"); *id.* at 4:57-59 ("The RTO management system 30 or any associated server may be of any appropriate design, in general, including a main frame, mini-computer or a personal computer system."); *id.* at 14:11-14 ("The retail e-commerce server/computer 530 and server/computer 540 may be of any appropriate design, in general, including a main frame, mini-computer or a personal computer system."); *id.* at 14:7-11, 25:64-67 (RTO plug-in 532 is simply a "software application . . . suitable for accessing and communicating with" the RTO management system; it may be implemented in through "conventional" computer software "using any suitable programming language.").)

## <u>LEGAL STANDARDS</u>

To survive a motion to dismiss, "[a] complaint must 'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Canon, Inc.* v. *TCL Elecs. Holdings Ltd.*, 2020 WL 1478356, at *4 (E.D. Tex. Mar. 25, 2020) (citation omitted).

"Patent eligibility can be determined at the Rule 12(b)(6) stage" when there are no factual allegations at issue. *Voter Verified, Inc.* v. *Election Sys. & Software LLC*, 887 F.3d 1376, 1384 (Fed. Cir. 2018). In making this determination, "[a] court must accept the complaint's factual allegations as true and must 'draw all reasonable inferences in the plaintiff's favor.'" *Intell.*

*Ventures II LLC* v. *Sprint Spectrum L.P.*, 2018 WL 6804804, at *1 (E.D. Tex. Sept. 24, 2018) (citation omitted). "However, the Court need not accept as true legal conclusions couched as factual allegations." *Id*. Courts routinely determine patent subject-matter eligibility at the motion to dismiss stage. *SAP Am., Inc.* v. *InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018); *Two-Way Media Ltd.* v. *Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1341 (Fed. Cir. 2017).

## ARGUMENT

## I.    CLAIM 1 OF THE '682 PATENT IS REPRESENTATIVE.

It is appropriate to analyze a representative claim for patent-eligibility under § 101 where the challenged claims are "substantially similar and linked to the same ineligible concept." *Mobile Acuity Ltd.* v. *Blippar Ltd.*, 110 F.4th 1280, 1290 (Fed. Cir. 2024) (internal quotation marks and citation omitted). Here, Claim 1 of the '682 patent ("Claim 1") is representative of the other claims in the Asserted Patents for § 101 purposes—indeed, Plaintiff primarily relied on Claim 1 for these purposes in the FAC. (*See* FAC ¶ 38.) Claim 1 is substantially similar to all other claims of the Asserted Patents, and they are all "linked to the ineligible concept" of facilitating an RTO transaction.

This Court has recognized "three justifications" for a claim being representative: "terminal disclaimer, common specification and particularized analysis tethered to the claim language." *PPS Data, LLC* v. *Jack Henry & Assocs., Inc.*, 404 F. Supp. 3d 1021, 1036 (E.D. Tex. 2019). Each of these justifications is present here, linking the claims of the five Asserted Patents.

*First*, the Asserted Patents share a common specification. *PPS Data*, 404 F. Supp. 3d at 1035 ("A common specification is some . . . indication of representativeness."). The '687, '969, and '611 patents are straight continuation applications of, and claim priority to, the '682 patent, and thus these patents necessarily share a common specification. And, while the '778 patent is a continuation-in-part of the '682 patent and contains a few additional disclosures, it includes the

specification of the '682 patent in its entirety.  (*Compare* '778 pat., 1:30-24:24, 37:19-43:2, *with* '682 pat., 1:17-28:51.)  Moreover, the additional disclosures in the '778 patent consist of material that is not relevant to the § 101 analysis, as they merely describe the use of generic API technology and certain additional (and traditional) steps that an e-commerce retailer might take in connection with its use of an RTO payment option, such as choosing a product on a webpage, shipping a product, or processing a return of the product.

*Second*, the Asserted Patents are linked by terminal disclaimers to the '682 patent (and the '778 patent) in an attempt to overcome obviousness-type double patenting rejections.  The '687 patent is subject to terminal disclaimer as to the '682 and '778 patents; and the '969 and '611 patents are subject to terminal disclaimer as to the '687 patent (linking them back to the '682 patent).  These terminal disclaimers support representativeness because they are "a strong clue that . . . the applicant[] thought the claims . . . lacked a patentable distinction over the parent." *PPS Data*, 404 F. Supp. 3d at 1034 (citation omitted).

*Third*, as shown in Appendix I, the similarity of the claim language establishes that Claim 1 is representative of each of the independent claims identified in the FAC.  *See id*. at 1035 (representativeness must be determined "by reference to the claim language").  Like Claim 1, all of the other independent claims of the Asserted Patents recite language directed to exchanging information to facilitate an RTO transaction.  (*See* App. I (brown highlights).)  In addition, all of the independent claims of the Asserted Patents recite a generic consumer computer device, e-commerce server, RTO management system, and RTO plug-in.  (*See id.* (green, red, blue, and yellow highlights, respectively).)  And all of the independent claims of the Asserted Patents recite language ascribing the same two functions to the RTO plug-in—integrating an RTO payment option into a checkout screen and serving as an intermediary for communications between the

customer and the RTO provider.  (*See id.* (purple and orange highlights, respectively).)

Claim 1 also is representative of each of the dependent claims of the Asserted Patents.  The dependent claims include each of the limitations of the independent claims and add nothing of significance to the § 101 analysis.  The dependent claims merely recite additional steps for collecting, transmitting, or displaying information to facilitate an RTO transaction.  (*See, e.g.*, '682 pat., claim 2 (reciting "[t]he system of claim 1, wherein the RTO management application is further programmed to deduct the periodic payment from an account associated with the consumer"); '778 pat., claim 8 (reciting "wherein the RTO computer device is further programmed to determine that the selected product is available from an order fulfillment system; and request that the order fulfillment system provide the selected product to the user.").)

Moreover, Plaintiff has effectively conceded that Claim 1 is representative for § 101 purposes.  In a section of the FAC titled "The Asserted Patents and Patent Eligibility Under 35 U.S.C. § 101," Plaintiff relies on Claim 1 as reciting the "technological features . . . found in the claims of the Asserted Patents" that purportedly support eligibility.  (FAC ¶ 38.)  Indeed, Plaintiff has expressly confirmed that Claim 1 captures the two functions of the RTO plug-in that Plaintiff contends are innovative in all of the Asserted Patents—integrating an RTO payment option into an e-commerce checkout page and acting as an intermediary for communications between the customer and the RTO provider.  (FAC ¶¶ 35, 37-39.)

To be sure, however, Plaintiff declares in the FAC that "no one claim of the Asserted Patents is representative of the other claims found in the Asserted Patents" and points to claim 1 of the '778 patent and claim 14 of the '682 patent as disclosing "their own patent-eligible technological improvements."  (FAC ¶¶ 38, 44-45.)  But neither of these claims is materially different from Claim 1 of the '687 patent for purposes of the § 101 analysis.

*Claim 1 of the '778 patent.*  Claim 1 recites that "the retailer computer device further comprises an application program interface (API)."  The specification of the '778 patent discloses the RTO plugin "may be configured to communicate" with other systems using a traditional, generic "application program interface" or "API."  ('778 pat., 24:52-25:7.)  An API is nothing more than software that allows a programmer to include "certain functions into . . . programs, rather than write their own code to perform those function from scratch."  *Oracle America, Inc.* v. *Google Inc.*, 750 F.3d 1339, 1349 (Fed. Cir. 2014).  In the '778 Patent, the API "may provide one or more commands . . . that may be invoked by the various components [of the network] to request information and/or action from one or more of the other components."  ('778 pat., 24:52-25:7.)  Without further description of what the API is or how it works, the specification states that "the API . . . may be configured according to any suitable standard or protocol."  (*Id.*)  The recitation in claim 1 that the "retailer computer device" includes an "application program interface (API)"— an API so generic that it may be configured according to "any" protocol—to provide pre-written functions that can be used to "execute the RTO Payment routine" adds nothing of significance to the § 101 analysis, nor does it render the claim less representative of the claims of the '778 patent.  *Cf. cxLoyalty, Inc.* v. *Maritz Holdings Inc.*, 986 F.3d 1367, 1380 (Fed. Cir. 2021) (finding claim ineligible under § 101 despite recitation of "multiple APIs," because this recited only "wholly conventional techniques specified at a high degree of generality").

*Claim 14 of the '682 patent.*  The specification of the '682 patent provides that one of the transaction screens may "comprise[] an RTO log-in field" and "[c]onsumers **10** who already have an account . . . with the RTO management system may enter their log-in information into this field and select the Log-In button to log-in to the RTO management system through the RTO plug-in and continue the transaction."  ('682 pat., 22:13-18.)  Here too, the specification fails to provide

any further description of what this "log-in field" is or how it works, and it appears only in claim 14 of the '682 patent, which recites a RTO transaction screen comprising "a log-in field for a registered consumer to log-in to the RTO management system via the RTO plug-in."   The recitation of a "log-in field" does not add anything of significance to the § 101 analysis or make Claim 1 less representative because the '682 patent "does not claim to improve log-in technology or provide an innovative method of logging in, but instead merely discusses logging in as a way to" facilitate an RTO transaction.  *Broadband iTV, Inc.* v. *Amazon.com, Inc.*, 113 F.4th 1359, 1374-73 (Fed. Cir. 2024).  "Adding a generic log-in step to achieve the abstract idea of [facilitating an RTO transaction] does not sufficiently transform the abstract idea."  *Id.*

For all these reasons, Claim 1 of the '682 patent is representative for purposes of determining subject-matter eligibility, and so Katapult focuses its analysis on that claim.

## II.  THE CLAIMS ARE INVALID FOR FAILURE TO CLAIM PATENTABLE SUBJECT MATTER.

The Supreme Court has long held that "laws of nature, natural phenomena, and abstract ideas" do not meet the patentable subject-matter requirements of 35 U.S.C. § 101.  *Alice Corp.*, 573 U.S. at 216.  These "basic tools of scientific and technological work" are "ineligible for patent protection" because to award a patent for them would risk "inhibit[ing] further discovery by improperly tying up the[ir] future use."  *Id.* at 216-17; *Mayo Collaborative Servs.* v. *Prometheus Lab'ys, Inc.*, 566 U.S. 66, 85-86 (2012).

Whether a claim is directed to ineligible subject matter is "a threshold inquiry" that should generally be decided before other issues in an infringement case.  *In re Bilski*, 545 F.3d 943, 950 (Fed. Cir. 2008).  As such, this Court has recognized that a determination of invalidity under § 101 "may be made at the pleading stage on a motion to dismiss."  *Clear with Computers LLC* v. *Altec Indus., Inc.*, 2015 WL 993392, *3 (E.D. Tex. Mar. 3, 2015) (granting motion to dismiss).

In *Alice*, the Supreme Court set out a two-step analysis for determining whether a claim is directed to patent-eligible subject matter.  At Step One, a court must determine whether the claim is "directed to a patent-ineligible concept," such as a law of nature or abstract idea.  *Intell. Ventures II*, 2018 WL 6804804, at *2 (quoting *Alice*, 573 U.S. at 218).  If it is, then at Step Two, the court "consider[s] the elements of each claim both individually and as an ordered combination to determine whether additional elements transform the nature of the claim into a patent-eligible application."  *Id.* (quoting *Alice*, 573 U.S. at 217) (internal quotation marks omitted).  And those "additional steps" must be more than "well-understood, routine, conventional activity."  *Mayo*, 566 U.S. at 79-80; *see also Hawk Tech. Sys., LLC* v. *Castle Retail, LLC*, 60 F.4th 1349, 1359 (Fed. Cir. 2023) (reciting generic and expected computer system functionality does not transform an abstract idea into a patent-eligible invention).

Even taking the FAC's allegations as true, the claims of the Asserted Patents fail at both steps of *Alice* and are therefore invalid.

## A.    THE CLAIMS ARE DIRECTED TO AN ABSTRACT IDEA AT ALICE STEP ONE.

At *Alice* Step One, a court must consider whether, "in light of [its] specification," the patent's claims "as a whole are directed to" an abstract idea or other patent-ineligible concepts. *Umbanet, Inc.* v. *Epsilon Data Mgmt., LLC*, 263 F. Supp. 3d 647, 651 (E.D. Tex. 2017).

### 1.    The Claims Are Directed to the Well-Known Business Method for Rent-to-Own Transactions.

Claim 1 is directed "to systems and methods for facilitating" the well-known and abstract idea of facilitating an RTO transaction.  ('682 pat., Abstract.)  Obtaining access to a product by means of an RTO transaction is a long-standing business practice that has been used by "million[s]" of consumers since the 1950s.  (*See* '682 pat., 1:31-35.)  This articulation of Plaintiff's purported invention is consistent with the problem the Asserted Patents sought to solve—the

"need" to make RTO transactions, which had existed for decades, "even more accessible and efficient to consumers" seeking to obtain goods.[3]  (*Id*. at 1:45-48.)  As a solution, the inventors proposed "a computer-implemented system and method for processing" an RTO transaction.  (*Id.* at 2:55-57.)  This is a classic "do it on a computer" implementation of an old business method, which is not patentable.  *See Alice*, 573 U.S. at 225 (claim that "simply recite[s] the concept of [a long-known business method] as performed by a generic computer" is not patent-eligible").

The abstract idea of facilitating an RTO transaction is the "focus of the claims . . . as a whole."  *Elec. Power Grp.*, *LLC* v. *Alstrom*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (internal quotation marks omitted).  Every limitation of Claim 1 is directed to this idea.  Claim 1 first recites the three potential parties to an RTO transaction, including a consumer computer device, an RTO management application, and an e-commerce website running on an e-commerce server.  ('682 pat., 28:54-29:5.)  The e-commerce server has software (an "RTO plug-in") that is "executable . . . to complete an online RTO transaction."  (*Id*. at 29:1-4.)  The system allows a consumer to "initiate the online RTO transaction" on the e-commerce website, and then recites the exchange of the information needed to "complete" the transaction, including "describing the . . . good" to be accessed under the RTO transaction.  (*Id*. at 29:6-30.)  The RTO management application receives that information and uses it to determine the terms for the transaction, then exchanges information regarding the offer and acceptance of those terms with the consumer device to complete the RTO transaction.  (*Id.* at 29:17-41.)

Although neither the Supreme Court nor the Federal Circuit has defined what makes an idea abstract, they "have found it sufficient to compare claims at issue to those claims already

---

[3]    *See ChargePoint, Inc.* v. *SemaConnect, Inc.*, 920 F.3d 759, 767-68 (relying on the "problem facing the inventor" defined in patent specification to confirm the claims were directed to an abstract idea).

found to be directed to an abstract idea in previous cases." *Umbanet, Inc.*, 263 F. Supp. 3d at 651 (E.D. Tex. 2017) (internal quotation marks omitted).  Claim 1 exhibits several features that are well-settled indicators of abstractness:  it is directed to a fundamental economic practice; it recites steps of gathering, exchanging, and displaying information; it uses results-oriented functional language; and it does not improve computer or network technology.

### 2.    Claim 1 Is Directed to a Commercial Transaction.

Both the Supreme Court and the Federal Circuit repeatedly have held that claims directed to "fundamental economic practice[s]" and "creating a contractual relationship" are directed to abstract ideas.  *See, e.g.*, *Alice*, 573 U.S. at 219, 221 (holding claims directed to intermediated settlement, a "fundamental economic practice long prevalent in our system of commerce," to be "squarely within the realm of abstract ideas"); *Bilski* v. *Kappos*, 561 U.S. 593, 611 (2010) ("[T]he basic concept of hedging, or protecting against risk . . . is an unpatentable abstract idea."); *Beteiro, LLC* v. *DraftKings, Inc.*, 104 F.4th 1350, 1357 (Fed. Cir. 2024) ("The claims here are directed to a fundamental and longstanding economic activity, *i.e.*, an abstract idea"); *Elec. Commc'n Techs., LLC* v. *ShoppersChoice.com, LLC*, 958 F.3d 1178, 1182 (Fed. Cir. 2020) (verifying the identity of a user to facilitate a transaction is a "fundamental economic practice" that renders claim abstract); *buySAFE, Inc.* v. *Google, Inc.*, 765 F.3d 1350, 1354-55 (Fed. Cir. 2014) (holding claim directed to "creating a contractual relationship" by "providing a transaction performance guaranty" to be directed to an abstract idea).  In short, just as in *Alice* and the other cases with claims directed to long-standing economic practices and the creation of legal relationships, Claim 1's focus on facilitating an RTO transaction is an abstract idea.  *See Beteiro*, 104 F.4th at 1355 (claims directed to the idea of "exchanging information concerning a bet and allowing or disallowing the bet based on where the user is located" were abstract).

    **3.**     **Claim 1 Is Directed to Mental Processes that Can Be Performed in the Human Mind.**

The Federal Circuit has repeatedly held that "claims to mental processes, even if performed on a computer rather than in the human mind," are directed to abstract ideas. *In re Killian*, 45 F.4th 1373, 1382 (Fed. Cir. 2022). This includes claims, like here, that require interacting human minds to exchange information. For example, in *Clear with Computers*, this Court found abstract a claim directed to the use of a computer to receive information about customer preferences, store that information, and use it to create targeted sales brochures. 2015 WL 993392, at *4. The Court found the claim abstract because "[t]he steps performed by the claimed computer elements are functional in nature and could easily be performed by a human." *Id*.

Likewise, here, Claim 1 is directed to the automation of tasks that could be, and have been, performed by people without computers. The claim outlines a process that is essentially the same as the exchange of information to obtain access to goods via an RTO transaction in a traditional brick-and-mortar store. *See Beteiro*, 104 F.4th at 1355 (finding claims abstract in part because "the district court was able to persuasively analogize Beteiro's patent claims to longstanding 'real-world' ('brick and mortar') activities."). For decades, a customer could go to a brick-and-mortar retail store and choose a product the customer would like to acquire on an RTO basis. (FAC ¶ 19 ("Traditionally, consumers . . . had to visit a brick-and-mortar RTO store.").) At checkout, the customer would exchange information with the retailer or a third-party RTO provider to enter into an RTO agreement to lease or rent the product "in exchange for a regularly scheduled payment with the option to purchase at some point during the agreement." ('682 Patent, 1:20-24.)

The Asserted Patents simply put all of that on a computer, "mak[ing] the RTO transactions more accessible to more people by eliminating the requirement that the consumer physically visit a brick and mortar RTO store or other retailer that offers such a program." (*Id.* at 3:17-21.) But

the steps required to consummate the RTO transaction are the same.  The customer corresponds to the consumer and the consumer computer devices in the claims, the brick-and-mortar store corresponds to the e-commerce server, the RTO provider corresponds to the RTO management application, and the paper forms or display screens used in the RTO store to transmit information between the consumer and the RTO provider to complete the transaction correspond to the RTO plug-in and the "interfaces" provided by the RTO provider though the plug-in.

Because the claims are directed to a long-standing economic practice that can be carried out by humans without a computer—a typical RTO transaction—it is directed to an abstract idea.

### 4.    The Limitations of Claim 1 Are Recited in Result-Focused, Generic Language.

Courts have also held that claims directed simply to gathering, transmitting, manipulating, and/or displaying information are abstract, particularly where, as here, these steps are recited in "result-focused functional language."  *Beteiro*, 104 F.4th at 1356; *see also AI Visualize, Inc.* v. *Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1378 (Fed. Cir. 2024) ("We have explained that the steps of obtaining, manipulating, and displaying data, particularly when claimed at a high level of generality, are abstract concepts."); *Interval Licensing LLC* v. *AOL, Inc.*, 896 F.3d 1335, 1345 (Fed. Cir. 2018) ("acquiring and organizing information . . . is an abstract idea"); *Elec. Power Grp.*, 830 F.3d at 1354 (Fed. Cir. 2016) (finding "a process of gathering and analyzing information of a specified content, then displaying the results" abstract).[4]

---

[4]    Other Federal Circuit decisions have reached the same conclusion.  *E.g.*, *Cyberfone Sys., LLC* v. *CNN Interactive Grp., Inc.*, 558 F. App'x 988, 992 (Fed. Cir. 2014) ("Here, the well-known concept of categorical data storage, *i.e.*, the idea of collecting information in classified form, then separating and transmitting that information according to its classification, is an abstract idea that is not patent-eligible."); *RecogniCorp, LLC* v. *Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) ("[T]aking two data sets and combining them into a single data set" to form a composite image was directed to the abstract idea of "organizing information through mathematical correlations.").

Although Plaintiff declares without basis that "the claims of the Asserted Patents . . . specify *how* the RTO plug-in completes the RTO transaction" (FAC ¶ 43), Claim 1 merely recites generic, result-driven limitations directed to exchanging, manipulating, and displaying information necessary to facilitate an RTO transaction. For example, the claim recites that the RTO plug-in is "executable . . . to complete an e-commerce transaction," the epitome of result-driven, generic language that does not say *how* the RTO plug-in completes the e-commerce transaction. The limitations regarding displaying data recited in Claim 1 also are recited at a high level of generality, including "*providing*" an e-commerce website, "*providing* . . . an RTO website," "*provid[ing]* an e-commerce . . . user interface," and "*integrating* . . . an RTO control element in a payment option field"—none of which say *how* the steps are to be done. The steps of obtaining or exchanging data recited in Claim 1 also are generic: "*receiv[ing]* . . . input data," "*receiv[ing]* . . . an indication of a good selected by the consumer," "*receiv[ing]* data describing the good," "*transmit[ting]* . . . an indication of terms," "*receiv[ing]* . . . an acceptance of terms," and "*provid[ing]* a transaction confirmation interface." The only computational/data manipulation limitation recited in the claim is generic and result-focused: "*determin[ing]* a spending limit," again without any description of how that limit is determined. Plaintiff repeats those generic steps in the FAC and asserts that they "specify *how* the RTO plug-in completes the RTO transaction" (FAC ¶ 43), but this is conclusory and incorrect. The language recited in Claim 1 provides no specificity about how the purported invention achieves a particular goal (beyond the fact that it must do so using a computer), which is "almost always found to be ineligible for patenting under § 101." *Beteiro*, 104 F.4th at 1356. In *Beteiro*, for example, the court considered claims to a computer-implemented method for allowing or disallowing a bet depending on where the bettor was located. *Id*. The court found that the claims were abstract because the claim limitations recited "generic steps" such as "receiving a

message," "generating and transmitting" a notification, "determin[ing]" whether a condition has been met, and "processing" information. *Id.*

Claims focused on "collecting information, analyzing it, and displaying certain results of the collection and analysis" are abstract. *Elec. Power Grp.*, 830 F.3d at 1353-54. In *Electric Power*, the claim recited a "method for detecting events on an interconnected electric power grid in real time." *Id.* at 1352. Like Claim 1, the method comprised result-oriented steps: "receiving data," "detecting and analyzing" the data, "displaying the . . . analysis results," "accumulating and updating" additional measurements, and "deriving a[n] . . . indicator" using measurements. *Id.* The Federal Circuit held the patent invalid under § 101. The same result follows here.

Claim 1 is thus abstract at least because the claim "omit[s] any specific requirement as to how [the] steps" of data collection, manipulation, and display "are performed." *Mobile Acuity*, 110 F.4th at 1292-93. The only limitation on the generic steps of gathering and transmitting data is that they must be carried out "via the RTO plug-in." But the plug-in is simply a conventional "software application" that could be written by any person of skill in the art ('682 pat., 4:57-60, 25:63-26:22), and all that is claimed is what the plug-in does, not how it works or performs the other functions required by Claim 1. The "RTO plug-in" limitation does not provide any specific limit on how information is gathered or received by the claimed system and thus does not change the abstract nature of the claim. *See, e.g.*, *Mobile Acuity*, 110 F.4th at 1293 (finding claim abstract where limitation requiring that portions of two images correspond failed to provide details as to "how the corresponding portions of images are determined").

The fact that the generic steps are directed to information of a particular type, namely, the information required to complete an RTO transaction, does not make the claims less abstract. The Federal Circuit has repeatedly held that the "particular content" of information that is collected,

-17-

analyzed, or displayed is irrelevant to whether the claim is abstract. *Elec. Power Grp.*, 830 F.3d at 1353-54 ("[W]e have treated collecting information, including when limited to particular content (which does not change its character as information) as within the realm of abstract ideas.").

5.    **The Recitation of Generic Computer Components Does Not Make the Claims Less Abstract.**

In addition to the abstract idea to which they are directed, the claims of the '682 patent also recite other, more tangible (albeit generic) computer elements—specifically a "consumer computer device," an "e-commerce server," and an "RTO computer device." But these elements simply recite "the use of conventional or generic technology" in the particular environment of e-commerce. Their recitation does not change the § 101 analysis or give Plaintiff any plausible claim that the recited components "reflect . . . an inventive solution to any problem." *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016). The conventional physical components recited in Claim 1 "merely provide a generic environment" in which to carry out the abstract idea of exchanging information to facilitate or complete an RTO transaction "in an organized manner." *Elec. Power Grp.*, 830 F.3d at 1354 (the claim was invalid as it "d[id] not require any nonconventional computer, network, or display components . . . but merely call[ed] for performance of the claimed information collection, analysis, and display functions on a set of generic computer components"); *TLI*, 823 F.3d at 612 (claims were directed to an abstract idea despite recitation of "concrete, tangible components" such as "a telephone unit" and a "server").

Indeed, the Asserted Patents admit that the consumer's "computer device" may be any "suitable computer or computing device such as, for example, a tablet computer, a smart phone, a laptop computer, any other mobile computing device, a desktop computer, etc." ('682 pat., 4:33-36.) Likewise, the RTO computer device "may be of any appropriate design, in general, including a main frame, mini-computer or a personal computer system." (*Id.* at 4:58-59.) The same is true

of the claimed e-commerce server.   (*Id.* at 14:11-14.)   These admittedly generic computer components do not make the patents-at-issue eligible.

### 6.    The Claims Do Not Recite an Improvement in Computer Technology.

Even where patent claims recite the manipulation of data, a court may find that they are not directed to an abstract idea if "the focus of the claims is on a specific asserted improvement in computer capabilities."  *Enfish, LLC* v. *Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016). But that is not the case here.

In *Enfish*, the claimed invention was a "self-referential table for a computer database" that operated differently from prior art tables.  *Id.* at 1337.  Although the invention was embodied in software, the software would increase the available memory for any computer on which it was used and cause the computer itself to operate more quickly.  *Id.* (claimed invention resulted in "faster search times, and smaller memory requirements" on a computer using it).  The court found that the claims were not directed to an abstract idea because "the self-referential table recited in the claims . . . is a specific type of data structure designed to improve the way a computer stores and retrieves data in memory."  *Id.* at 1339.  In essence, the *Enfish* analysis determines whether the claims are technological in nature and improve the computer itself or are merely an abstract business method done on a general purpose computer that is used as a tool.  *Elec. Power Grp.*, 830 F.3d at 1354 (claims directed to receiving, organizing, and storing of data were not focused on "an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools").

Here, unlike in *Enfish*, neither the claims nor the specification describes any improvement in computer technology.  Neither describes an improvement in the way any computer collects data or processes transactions.  Rather, the purported improvement in the patent resides in a well-known business practice in widespread use long before the Asserted Patents were filed, and in putting it

-19-

on a generic computer that operates in generic ways.

According to the FAC, the "innovation" captured in Claim 1 lies in the RTO plug-in on the e-commerce server and its two functions:  (1) "integrat[ing]" a selectable RTO option (an "RTO control element") into the retailer's checkout page alongside other payment options, and (2) serving as an intermediary between the consumer and the RTO provider in exchanging information needed to carry out an RTO transaction.  (FAC ¶ 35.)  But these functions do not improve the computers' operation as computers.  Instead, Claim 1 and the specification of the '682 patent describe the RTO plug-in using purely functional terms and fail to describe any technical details about how it carries out those functions.  Claim 1 does not claim, and the specification of the '682 patent does not disclose, any improvement in *computers* due to the RTO plug-in.

Nor does the addition of an RTO control element on the retailer's checkout page save the claims.  The common specification here is limited to a description of several functions of the RTO plug-in, such as listing, among other payment options, an "RTO field 610 . . . populated by the RTO plug-in" and "facilitat[ing] communications between the consumer 10 and the retailer e-commerce server 530 and/or the RTO management application 544 . . . for consummating an RTO transaction."  (*Id.* at 15:42-53.)  There is no description—technical or otherwise—of ***how*** the RTO plug-in performs these functions, or of any improvement in the hardware or software that might be required.  This is not a case where the specification describes a technical solution to a technical problem.  *See Hawk Tech. Sys.*, 60 F.4th at 1358 ("[E]ven if the claims achieved this purported solution, they 'only use[] generic functional language to' do so and require nothing 'other than conventional computer and network components operating according to their ordinary functions.'" (alteration in original and citation omitted)).

The other purported innovation Plaintiff ascribes to the RTO plug-in—serving as an

intermediary between the consumer and the RTO provider to facilitate communications—also is described in a purely functional way without any description of improved hardware or software. The specification explains that, in response to a customer's selection of the RTO payment option, "the plug-in . . . may cause an interface for communicating with the RTO [management] application to be presented through the retailer e-commerce server" or it may "open on the customer's computer-based machine 20 an additional interface or window for communicating with the RTO management application." ('682 pat., 15:66-16:6.) Describing the RTO plug-in as "causing" the opening of an interface, or "opening" a window on another device does not disclose how these tasks are performed or describe any improvement in hardware or software that might be required to perform them. *See, e.g.*, *Interval Licensing*, 896 F.3d at 1347 (it is not even "arguably inventive to enable a person to access information over a network through a user interface").

Software recited only in broad, functional terms cannot establish an improvement in computer or network technology. *Interval Licensing*, 896 F.3d at 1346 (finding software did not improve computer technology where the improvement was "recited only at the broadest, functional level, without explaining how that is accomplished, let alone providing a technical means for performing that function"). The common specification here does exactly that, explaining that the plug-in is merely a generic "software module" or software application that can be executed by the retailer's e-commerce server to "perform certain tasks" in the "computer implemented method for offering an RTO payment option." ('682 pat., 23:65-67.) "[T]he operation and behavior" of the plug-in is described in the specification without specific reference to the "actual software code" or "specialized hardware" that it uses. (*Id.* at 26:14-16.)

The specification here even admits that the "software code or specialized control hardware . . . is not limiting of the present invention." ('682 pat., 25:61-63.) It is, therefore,

generic and cannot render the claim eligible. *See Trinity Info Media* v. *Covalent, Inc.*, 72 F.4th 1355, 1363 (Fed. Cir. 2023) (holding, at *Alice* Step One, that a statement in patent specification stating that "the present invention may be practiced without necessarily being limited to these specific details" confirmed that the inventors did not claim an improvement in computer capabilities).   In this case, the inventors' failure to disclose any improvement in computer technology is even clearer because, per the specification, creating the software or hardware needed to perform the functions ascribed to the plug-in, such as placing a selectable button on a checkout page or opening a window on a webpage, was routine at the time of the invention:

> [I]t is clearly understood that artisans of ordinary skill would be able to design software and control hardware to implement the embodiments of the present invention based on the description herein with only a reasonable effort and without undue experimentation.  ('682 pat., 26:18-22.)

### 7.    Claim 1 Does Not Solve a Technological Problem Rooted in Computer Network Technology.

Plaintiff alleges that the RTO plug-in, by permitting a consumer to complete an online RTO transaction "through the e-commerce server/website," solves the "technological" problem of "retaining control of these consumers" during an RTO transaction.  (FAC ¶¶ 35-37, 42-43.)  Some courts have held that claims, unlike the ones at issue here, that are directed to "specific technologic modifications to solve a problem" or "claims necessarily rooted in computer technology that overcome problems specifically arising in the realm of computer networks" may be patent-eligible. *Intell. Ventures I LLC* v. *T Mobile USA, Inc.*, 2018 WL 6584486, at *3 (E.D. Tex. Sept. 4, 2018) (citing *DDR Holdings, LLC* v. *Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014)).

In *Intellectual Ventures I*, the Court was "persuaded that the [at-issue] patent was directed to a technical solution to a technical problem"—namely, delivering Quality of Service information (which exists only in the context of wireless networks) via those networks. *Id*. at *3.  This rendered the claims eligible, because the specification provided a "detailed description" of the problems

solved by the inventors in a way that showed it was directed to an improvement in computer network technology. *Id*. Likewise, in *DDR Holdings*, the Federal Circuit analyzed claims reciting "e-commerce outsourcing system[s]" and various steps for creating "a composite web page." 773 F.3d at 1249-50. At *Alice* Step One, the Court found that the claims "address[ed] a business challenge (retaining website visitors) . . . particular to the Internet." *Id*. at 1257. As the Court explained, "these claims . . . do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet" and "do not broadly and generically claim use of the Internet to perform an abstract business practice (with insignificant added activity)." *Id*. at 1257-58. Instead, the claimed system "overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink" and causes the computer network not to "operat[e] in its normal, expected manner." *Id*. at 1259.

None of that is the case here. The claims do not solve a problem specific to the Internet or another computer network. Claim 1, for example, claims the conventional activity of an RTO transaction merely done on a generic computer network. Unlike *DDR Holdings*, this is not a change in the normal operation of a computer network. Instead, this behavior of the claimed plug-in is what is normal and expected of such a plug-in, which "artisans of ordinary skill would be able to design . . . with only a reasonable effort and without undue experimentation." ('682 pat., 26:17-22.) This case is more like *cxLoyalty*, in which the Federal Circuit invalidated a claim reciting the use of a computerized system, graphical user interface, and API for a commercial loyalty program. 986 F.3d at 1380. The court there rejected the patent owner's attempt to analogize the claim to *DDR Holdings*, noting that "the claims in *DDR Holdings* did not relate to a longstanding commercial practice but rather to a business challenge particular to the internet, and the claims did not merely employ conventional techniques to apply an abstract idea but rather involved the use

-23-

of a computer network operating outside its normal and expected manner." *Id.*

There is nothing in the specification here that indicates that the inventors sought to solve the problem of retaining control over consumers during an RTO transaction, or that they were even aware of it being a problem. In fact, the only problem discussed in the specification is "a need to make the RTO industry and an RTO transaction even more accessible and efficient." ('682 pat., 1:45-50.) And even here, the only solution offered by the Asserted Patents is not technological and not directed to an improvement in computer technology, because improving the availability and speed of a traditional business practice through automation using a computer does not improve the computer itself. *Customedia Techs., LLC* v. *Dish Network Corp.*, 951 F.3d 1359, 1364-65 (Fed. Cir. 2020) ("Improving a user's experience while using a computer application" or the "speed or efficiency inherent with applying the abstract idea on a computer" is not sufficient to render the claims directed to an improvement in computer functionality); *LendingTree, LLC* v. *Zillow, Inc.*, 656 F. App'x 991, 997 (Fed. Cir. 2016) (specification's disclosure that invention was intended "[to] speed[] up the loan-application process by enabling borrowers to avoid physically going to or calling each lender and filling out an application" was strong evidence that the at-issue claims were "not designed to solve a technological problem.").

Another example is *Simio, LLC* v. *FlexSim Software Prods, Inc.*, where the Federal Circuit rejected the patentee's argument that its claim improved computer technology "by employing a new way of . . . simulation modeling with improved processing speed." The Federal Circuit found that the alleged "improved processing speed" was not that of the computer; it concerned only the user's ability to build simulation models faster. 983 F.3d 1353, 1361 (Fed. Cir. 2020). Here, likewise, the alleged improvements in efficiency and availability provided by the specification and claims of the Asserted Patents relate only to the user's access to the RTO transaction itself, not to

any improvement in the computers or network used to carry out the transaction.

### B. THE CLAIMS DO NOT INCLUDE AN INVENTIVE CONCEPT AS REQUIRED AT *ALICE* STEP TWO.

The Asserted Patents are clearly directed to the abstract idea of facilitating an RTO transaction, and the Asserted Patents thus are invalid unless there is more to the claims, at *Alice* Step Two, "sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice Corp.*, 573 U.S. at 221 (citation omitted). Those additional features must be more than "well-understood, routine, conventional activity." *Clear with Computers*, 2015 WL 993392, at *4.

The claims of the Asserted Patents fail at Step Two because "[n]othing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology." *Hawk Tech. Sys.*, 60 F.4th at 1359. As discussed in the context of Step One, the consumer computer device, e-commerce server, and RTO management system are all described as computers of any type, without any inventive software or specialized hardware. *See supra* at Section II.A.5. The use of generic computer components in this way is conventional and well-understood. *Sanderling Mgmt. Ltd.* v. *Snap, Inc.*, 65 F.4th 698, 704-05 (Fed. Cir. 2023); *Customedia*, 951 F.3d at 1366 ("[T]he invocation of already available computers that are not themselves plausibly asserted to be an advance . . . amounts to a recitation of what is well-understood, routine, and conventional." (internal quotation marks omitted)).

During prosecution, the examiner correctly found that the claims of the '682 patent were "unquestionably" directed to the abstract idea of completing an RTO transaction, which he characterized as a "a fundamental economic practice" that is "foundational . . . to our . . . system of commerce." (Ex. B (Office Action dated Nov. 15, 2017 ('682 pat.)) at 5.) At Step Two, he found that the "claimed consumer device, the RTO system [and] the ecommerce server . . . are all generically recited and amount to reciting generic and well-understood computing hardware." (*Id.*

-25-

at 8.)  He also found that "a plug in is well understood in the computing field as being used to execute a particular function" and "the use of a plug in is well-understood, routine and conventional." (*Id.*)  Moreover, he found that one of the two features of the plug-in on which the FAC relies, the "use of a link or a button on an interface [*e.g.*, a checkout screen] that a user can select" was "well understood, routine and conventional in the computing field." (*Id.* at 9.)

However, the examiner ultimately allowed the claims based on the "absen[ce of] evidence" that the use of the plug-in to receive interfaces from the RTO management application to allow the transaction to be completed through the e-commerce server was "well understood, routine and conventional." (Ex. C (Office Action dated May 17, 2018 ('682 pat.)) at 3.)  This Court, however, is not bound by the examiner's allowance.  *Sanderling Mgmt.*, 65 F.4th at 705 ("[C]ourts are not required to defer to Patent Office determinations as to eligibility.").  The examiner was plainly wrong.  This use of a plug-in cannot supply the required inventive concept for at least three reasons:

*First*, the use of a plug-in to provide additional functionality to an e-commerce server/website to facilitate a transaction was clearly well-understood, routine, and conventional at the time of the invention of Claim 1.  As the specification itself discloses, at the time of the claimed invention, plug-ins were commonly "made available to an e-commerce platform or website as a downloadable computer software application available from an online application store" such as "MAGENTO, VOLUSION [or] SHOPIFY." ('682 pat., 3:60-65); *see also Weisner* v. *Google LLC*, 51 F.4th 1073, 1083 (Fed. Cir. 2024) (holding that a court may rely on statements in the specification to conclude that the claims rely on the use of existing technology).  It was also known that plug-in applications could be "customized to suit a particular website or platform." ('682 pat., 3:65-67.)  Moreover, as the examiner noted during prosecution of the '682 patent, "e-commerce websites [were] well-known as utilizing various plug ins that execute desired functionality" and

"the use of e-commerce plug ins that allow for transactions to occur online" was "well-known . . . to those of ordinary skill in the art." (Ex. B at 15.) So, if the use of plug-ins for online transactions was conventional, using them for doing an old business method (RTO transactions) online must also be conventional. Otherwise, any business method done on a computer using conventional software techniques would be patent-eligible. *See Accenture Glob. Servs., GmbH* v. *Guidewire Software, Inc.*, 728 F.3d 1336, 1345 (Fed. Cir. 2013) ("[G]eneralized software components arranged to implement an abstract concept on a computer . . . do[] not transform a claim reciting only an abstract concept into a patent-eligible system or method.").

*Second*, the use of an intermediary (here, the e-commerce server/website with the RTO plug-in) to carry out a transaction between the RTO system and the customer computer is itself an abstract idea. *See Alice*, 573 U.S. at 219-20 (finding no inventive concept where claims described a method of exchanging financial obligations between two parties using a third-party intermediary); *Universal Secure Registry LLC* v. *Apple, Inc.*, 10 F.4th 1342, 1350 (Fed. Cir. 2021) (finding no inventive concept where claim involved "allowing a financial transaction [an electronic payment] between two parties using a third-party intermediary"). Because the use of an intermediary to facilitate or complete an RTO transaction is itself an abstract idea, it "cannot serve as an inventive concept." *Id.* (citation omitted).

*Third*, while the FAC makes the conclusory assertion that the "plug-in changes the normal operation of an online RTO transaction conducted on a computer" (FAC ¶ 37), it fails to plausibly allege any change to the normal operation of a computer or computer network. Claim 1 is thus unlike the claims at issue in *DDR Holdings*, which recited a system that generated a "hybrid" webpage that combined product information from a third-party website combined with the "look and feel" of a host website. 773 F.3d at 1257-58. When the user clicked on a hyperlink for the

product, instead of going from the host website to the third-party website, the user was taken to the hybrid webpage.  Thus, the claims in *DDR Holdings* specified a novel way to provide "a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink."  *Id.* at 1258.  This feature provided an inventive concept because it solved a problem specific to the internet and therefore changed the operation of that computer network from "its normal expected manner."  *Id.* at 1259; *see cxLoyalty, Inc.*, 986 F.3d at 1380.

Here, unlike the claims in *DDR Holdings*, Claim 1 merely recites the application of a known business practice and the creation of contractual relations to the particular environment of e-commerce.  *See Elec. Power Grp.*, 830 F.3d at 1354 ("Limiting the claims to the particular technological environment of power-grid monitoring is . . . insufficient to transform them into patent-eligible applications of the abstract idea at their core.").  Critically, nothing in the specification indicates that use of the RTO plug-in changes the normal operation of a network or modifies the expected sequence of events following the selection of a payment option on a checkout screen.  *See id.* at 1356 (no inventive concept where claimed functions were performed "by use of . . . entirely conventional, generic technology").  Merely opening a window or providing an interface, which is all that the specification describes, were well-understood and conventional computer techniques at the time of the invention.  *See Secured Mail Sols. LLC* v. *Universal Wilde, Inc.*, 873 F.3d 905, 912 (Fed. Cir. 2017) ("Rather than citing a specific way to solve a specific problem as in *DDR*, the asserted claims cite well known and conventional ways to allow generic communication between a sender and recipient using generic computer technology.")  The Asserted Patents claim only the abstract idea of completing an RTO transaction and nothing more.  The patents thus are invalid under § 101 and the FAC should be dismissed in its entirety.

## III.    THE § 101 ANALYSIS DOES NOT REQUIRE CLAIM CONSTRUCTION.

Plaintiff's request for claim construction prior to a decision on Defendants' motions to

dismiss should be rejected because Plaintiff has not, and cannot, explain why claim construction is necessary to evaluate the claims of the Asserted Patents under § 101. During the meet-and-confer process in connection with Defendants' prior motion to dismiss, Plaintiff made the conclusory assertion that "[c]onstruction is needed to give [the claims] their proper scope and weight in connection with the technological solution that the claimed inventions provide." (Ex. D (Dec. 24, 2024 Email from J. Kaericher).) But that assertion fails because none of the claim terms Plaintiff has identified as requiring construction will have any impact on the Court's § 101 analysis—irrespective of their ultimate construction. As such, the Court need not "delay its § 101 ruling while the parties continue to expend significant resources which will not impact or aid the Court in reaching this decision." *Clear with Computers*, 2015 WL 993392, at *3.

Plaintiff's own actions during prosecution are inconsistent with its argument here that claim construction is needed. Although Plaintiff faced numerous rejections on § 101 grounds at the USPTO, it never argued that construction was necessary to overcome those rejections. The same is true with respect to Plaintiff's FAC, which devotes two dozen paragraphs to arguing that "[t]he claims of the Asserted Patents are eligible under 35 U.S.C. § 101" without any suggestion that any construction was required to reach that conclusion. (FAC ¶¶ 23-47.)

During the required meet-and-confer process for Defendants' original motions to dismiss, Plaintiff identified two sets of terms as potentially requiring construction: the so-called "Integrate/Interface" terms and the "Via the RTO plug-in" terms. (Ex. D.) But these terms simply recite the use of generic computer hardware and software to perform generic steps of receiving, processing, and transmitting financial data to facilitate a rent-to-own transaction; their construction, however narrow, cannot impact the Court's § 101 analysis. As the Patent Office recognized, "[a]ll websites include[] interfaces that present information or allow for data entry to

occur." (Ex. E (Office Action dated Sept. 30, 2019 ('687 pat.)) at 4.) It also recognized that the claimed plug-ins are "not some special computer element that the applicant has invented," but simply "allow for a website to have the functionality of allowing a user to select an item that is part of a transaction," which is "what plug-ins are known for in the field of e-commerce." (Ex. F (Office Action dated June 11, 2020 ('687 pat.)) at 19.) Where, as here, "the basic character of the claimed subject matter in dispute is clearly evident to the Court, no further construction of the claims is required." *Network Architecture Innovations LLC* v. *CC Network Inc.*, 2017 WL 1398276, at *3 (E.D. Tex. Apr. 18, 2017). More importantly, no matter how narrowly those terms are construed will not change the fact that they are well-known, conventional computer elements or that they cannot add any inventive matter that transforms the ineligible RTO abstract idea into patent-eligible matter. In the end, the patents here simply claim an RTO transaction on a computer. Plaintiff's only explanation about why claim construction is necessary was that "[c]onstruction is needed to give them their proper scope and weight in connection with the technological solution that the claimed inventions provide," without identifying the "proper scope and weight" of the claim terms supposedly in dispute. (Ex. D.) Plaintiff's conclusory explanation does not come close to establishing that "construing these terms would . . . alter the Court's analysis under § 101." *Voxathon LLC* v. *Alpine Elecs. of Am., Inc.*, 2016 WL 260350, at *2 (E.D. Tex. Jan. 21, 2016).

## <u>CONCLUSION</u>

For the foregoing reasons, the FAC should be dismissed with prejudice.

Dated: February 6, 2025

Respectfully submitted,

*/s/ Russell A. Korn*

GILLAM & SMITH, LLP
Melissa R. Smith
(Texas State Bar No. 24001351)
303 South Washington Avenue
Marshall, TX  75670
Telephone: 903 934-8450
Facsimile: 903 934-9257
Email:  melissa@gillamsmithlaw.com

Of Counsel:

KILPATRICK TOWNSEND & STOCKTON LLP
Russell A. Korn (Lead Attorney)
Georgia Bar No. 428492
rkorn@ktslaw.com
Richard W. Goldstucker
Georgia Bar No. 940472
rgoldstucker@ktslaw.com
Andrew N. Saul
Georgia Bar No. 627607
asaul@ktslaw.com
Christopher S. Leah
Georgia Bar No. 396228
cleah@ktslaw.com
Marianthi M. Karas
Georgia Bar No. 698932
mkaras@ktslaw.com
Suite 2800, 1100 Peachtree Street NE
Atlanta, GA  30309-4528
Telephone:   404 815 6500
Facsimile:   404 815 6555

*Attorneys for Defendant Katapult Holdings, Inc.*

## CERTIFICATE OF COMPLIANCE WITH THE COURT'S
## 35 U.S.C. § 101 MOTION PRACTICE ORDER

_____    The parties **agree** that prior claim construction is not needed to inform the Court's analysis as to patentability

__X__    The parties **disagree** on whether prior claim construction is not needed to inform the Court's analysis as to patentability.


_/s/ Russell A. Korn_____
Russell A. Korn


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that counsel of record who are deemed to have consented to electronic services are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on this the 6th day of February, 2025.

_/s/ O grkauc 'T0Ub kj_____
Melissa R. Smith

-32-